I have an in-law who lives in another state. He owns a Fox Terrier, but that's not important. Merle mentioned my story. He owns a gun, and he carries his gun wherever he goes. Now, my wife and I, we don't like guns. We tell him if he comes to our house, he can't bring his gun. He doesn't visit much. But every now and then, we have to visit him, family obligation. Now, suppose we go and we have to visit him, and we're walking, me and my in-law from our hotel or whatever, and we get in an argument with someone on the street. Excuse me. You're speaking so fast. Okay, I'll slow down. I'm having trouble understanding what you're saying. Thank you for letting me know. Thank you. So we get in an argument in the street, and the two people we're in an argument with run down the street, and we chase after him. And the next thing I know is my in-law pulls out his gun and shoots him before I have a chance to react. Now, as a matter of absolute truth, I'm not guilty of any crime. I didn't know what my in-law was going to do. I mean, in your case, the problem is the Jackson standard. Could any reasonable juror have concluded that Juan H., along with his brother, decided to kill the two guys? Right. Or at least more accurately. The evidence that I can see for that is they ran to get the gun together. Unlike you and your in-law, you being a gun objector. But in this case, they ran together to get the gun. And then Juan H. shouldn't say, oh, no, guns, I'm having nothing to do with that. He went with his brother back to the confrontation with the gun. And then after the confrontation, there was the flight. Now, the flight didn't impress me all that much, because whether it was planned or not, there was reason to flee. But running together to get the gun, I wonder why that isn't enough under Jackson v. Virginia. Two reasons. One is it's speculative that they ran together to get a gun. I thought there was evidence to that effect. The jury might have rejected it, but I couldn't believe it. The evidence was they asked the surviving witness, before this whole confrontation happened, what happened. So I was walking down the street. I think they were exercising. I see Juan and Maradona, his brother, talking to some people in the white pickup. I think it was his family. And then I see them run. Where did they run to? To hide. Well, where did they run to? Well, I don't know. They ran somewhere. I don't know, really. It was an inarticulate way of saying, I don't know where they went. There's evidence that they ran. They were seen running together. Correct. There's not evidence except speculation, as I see it, that when Juan ran, he knew they were running to get a gun. The other part that bothers me is somehow. Is that right? There's no evidence for that. Right. I believe that also. You would claim that's not a reasonable inference. Yeah. Also, when they come back, there's certainly evidence, at least for my thinking, from which a jury could find, or a judge could find, that Juan knew that his brother had a gun, because there's some testimony it was on the brother's side. So Juan knows his brother's giving all inferences to the prosecution. It seems like you have to look at it. There's evidence that Juan ran somewhere with his brother, and after that he stands behind his brother at a confrontation, knowing his brother's got a gun on his side. So then, given that, why don't you give me your best argument that there still is no reasonable inference or evidence that meets the standard of aiding and abetting? Because we don't know what Juan is specifically intending, which is to get in his RAIA, and he's doing no act, the MACRA's RAIA, to assist or aid. As far as we know, Juan is telling his brother to cool off, don't do anything stupid. More so, the testimony was that Maradon came out, confronted a few people, asked a question, and then instantaneously pulled out the shotgun and shot them. Juan, for that matter, no one had any chance to react. There's no evidence Juan knew that Maradon was going to confront these people. The evidence would be if he ran together with them to get the gun. But we don't know they ran together to get the gun. If I were to get a gun, I guess you could get a gun to intimidate. Suppose you could get a gun for self-defense if your house had been shot up earlier. That's true. So I have some problem with the level of proof on the intent element under California law, whether the intent or purpose of committing or encouraging an offense is shown. And I have some problem whether there's a sufficient act or advice or aid or instigation or encouragement. But it is a very tough standard under Jackson, and we have to give every reasonable inference to the government. Correct. What I'm saying is there's not a reasonable inference that, going back to my example of the in-law, I know my in-law has a gun. That's why we don't invite him into our house. And I have the motive. I have an opportunity. We have flight. We have concerted action. But there's no evidence of what I'm actually intending to do. You need something more than just sort of tea leaves as to what he's actually intending. And you need something more than he just knows. The law specifically says mere knowledge and presence is not enough to be an aider, no better. And that's all that they have here. We have no evidence that Juan had any idea that Mirandon was going to confront these people with any kind of criminal act or to shoot them. Even if he had known he had a gun. How about the third element about acting or, by act or advice, aiding or promoting or encouraging or instigating commission of the crime? Is he aiding the commission of the crime in a street confrontation if he stands behind his brother? I don't think so. I mean, one of the points that came out twice during the testimony at the trial was they asked the surviving witness, did he flash any gang signs? Did he say anything? Did he make any indication? Did he do anything at all to help his brother? And the answer to all those questions was no. He did nothing. And it didn't matter to assist his brother in doing anything. What about the after the shooting, he runs into his house? He ran home, right. So that's the flight, I guess. Correct. Fifteen years old, he ran home. So basically his going home is the flight argument. And then when the police come, he gives them a story that he was in his room. Right. But the officer, and I've watched this videotape, the officer says that during the interview he twice admitted that he did go out to the street. To protect his family. You know, I guess I would say or ask, if he goes out to the street, assuming he did that, is that aiding or encouraging or promoting a deadly attack by his brother? No. A, because he's done nothing other than accompanying him and your presence is not enough. And B, because we still don't know why in the world his brother suddenly decided to shoot these people and whether or not Juan had any idea that he was going to do anything like this. My questions are largely for the government, but I'm framing them to you to give counsel for the government time to think about. What disturbed me the most about this case is if we were to suddenly assume, just sort of hypothetically, Juan is factually innocent and he was tagging along with his brother, he would not have done anything different. He's there, his brother suddenly pulls out the gun, he shoots, he runs home. But he had a motive here. He'd been punched in the nose and he was present. Why isn't motive, false alibi, running away and being present sufficient here? Because those are elements that help, those are factors that help you build on a foundation if you have some mens rea or access reas. You could have a guilty conscience and not be guilty of a crime. You could have anything that might indicate a guilty conscience, but there really isn't one. The point is, though, you still need some sort of evidence of what he's actually specifically intending to do. And you still need some evidence of him actually assisting and aiding. And the law says that these things individually are not enough. Putting them together, somehow they're supposed to be enough in this case, but they really aren't because they can't act as a substitute for the essential evidence of some evidence of what he's intending and some evidence that he's actually doing something. By the way, in terms of the police officer's statement, testimony, that in the interrogation he admitted to being out in the street. I really didn't quite see that. I'm wondering if there's, I saw a transcript where he says, yeah, in one question, but shortly after that he says no, and it wasn't clear to me what he was saying yeah to. I mean, is it clear that he admitted being out in the street finally? I say it's clear in the sense that everybody in the trial court thought it was clear that he did. And that, I think, is the flaw of the government's argument on appeal is basically the argument as to why there's not a coerced statement and therefore an effective system for counsel is Juan was misunderstood. But the problem is, is that he really wasn't, as far as the trial court is concerned, he really wasn't misunderstood. The problem was he clearly never voluntarily admitted he was out there. Well, he, if he said he was out there, maybe he did admit. The way the district attorney termed it was he conceded he was out there, which I think is a little more accurate because he's basically answering affirmatively to a question. I know, but you can ask somebody leading questions. We can ask you a leading question as you're arguing, and if you give us a concession, we can use it against your case. And in that position, you can ask leading questions. So I don't think it's wrong for the police to ask them. I'm not saying it isn't. What I'm saying is that, A, as a fact, did he admit he was out there? The question is you guys went out there to make sure nobody was coming, didn't you? And at first you didn't respond. You said you did, didn't you? Uh-huh. Or yeah. And then the second later on is because you didn't want someone coming over about to shoot your family, am I right? Uh-huh. Where are you in the excerpt? This is ER, I think it's around 27, 28, 29. But that's when they start to get asked the sort of the yes or no question. Well, he could also have been out there to look around and then went back to his room before the shooting. It's really not much of a record on it. But I guess giving under the Jackson standard, we probably have to say a jury could conclude he was out there. That's what the officer testified. Correct. I believe that's true. The problem, I think, is not whether he was there as far as the evidence, but what he was thinking and if he actually did anything. I've had this California case, People v. Beeman. Uh-huh. Sets out three elements for aiding and abetting. Is there any California case that puts more meat on the bones of what those elements are? You know, that says like if someone is just with someone, whether that is aiding and abetting. If a guy were standing behind a shooter in a jewelry store robbery or a convenience store and standing in the door, I suppose one could infer that maybe he's a lookout or he's assisting in some way. It's a little harder to infer that for me when he's standing in front of his home after it was shot up or standing behind his older brother. But I guess that's your argument is those elements aren't met, right? Correct. It is inherently fact intensive. But I think part of the issue here is that the actual shooting occurred instantaneously. He did nothing to assist or aid in the shooting. Any evidence in the record that he gave the gun to his brother? No. Or that he gave ammunition to his brother? No. You know, if we run dry, you may want to save some time for rebuttal. Okay. I guess I have the feeling from the trend of argument that we're going to have a lot of questions for your adversary. And she will probably have answers. And then you'll be aching to respond. I like your suggestion. Thank you. Good afternoon. May it please the Court, Deputy Attorney General Mood and Andy for respondents. The question before this Court is whether the state court unreasonably applied the Jackson v. Virginia standard. It is really hard under AEDPA, for me anyway as a judge, to say that the state court went beyond the bounds of reasonableness. However, in this case, I'm having trouble figuring out what the kid did except for being there. Okay. Well, we have to look at the totality of the circumstances. And here we have a number of factors that point towards his guilt. Tell me why any reasonable juror, why there could be some reasonable juror who would think he did something beyond just being there. We have, well, to answer a question that Judge Gould had earlier, is there any case that puts meat on the bones of what aiding and abetting means? Yes, there is. In our brief, we cited People v. Mitchell and Chagolla on page 10, which talks about that aiding and abetting, you need knowledge of the unlawful purpose of the perpetrator, an intent to encourage or promote the crime, and by act or advice to aid or promote or encourage the crime. Those are the same elements in that People v. Beeman case. And among the factors that may be considered are presence at the scene of the crime, which we have here, companionship, which we have here, conduct before and after the crime, including flight, which we have here. And when you look at the totality of the crime, how does he know his brother is going to kill the guy and try to kill the other one? They ran together to get the gun. But as opposed to intimidating him, I have a problem with this case, too. He's standing behind his brother. He has plenty of motive. He was there. We have all of the factors that you mentioned.  But Evan, the house had been shot up, et cetera. But how does he know his brother is going to kill as opposed to intimidate him? These victims, we know that his brother believed that these victims were the ones who shot the house. And we know that he had problems with these victims in the past and that his house was shot up only an hour and a half earlier. As the victims are walking across the street, he sees the victims, and he and his brother both run into the park. They run past their own house, so they're not going into their house. They're going somewhere, at which point his brother retrieves a gun. Okay. Stop. Wait. Hold it right there. All right. His brother gets a gun. They run together. We don't know whether he said to his brother, you really shouldn't get that gun or you ought to leave that gun there, or whether he said, get your gun and shoot those guys. There's no evidence at all about that. It's all in the area of inference. And it's really a question of what could a jury reasonably infer. Yes. What could a jury reasonably infer? So I'm having trouble seeing. I see that a jury can infer that he knew his brother was carrying a gun when they came back, but I haven't seen any evidence from which I think a jury could infer that when they first ran away, that they were running in his mind, in Juan's mind, to get a gun. So am I missing anything on that? If Juan wanted to disavow what his brother was doing, why would he then come back with him to confront the witnesses and stand behind him? That's a different question. I'm asking you, is there any evidence that supports that one could infer that when Juan first ran with his brother, he knew he was going to get a gun? And right now I'm not seeing that there is. I'm not saying that's the end of the case, but I'm just trying to find out from you if there's any evidence on that. At the point in time where they were running, no, not necessarily. So then they come back. Right. And we know his brother's, there's evidence that his brother has the shotgun. Right. Because he pulls it out of his side. Right. The waistband and shoots the victim. Right. And I guess there's also evidence that seems pretty clear that from where Juan's standing and the other testimony, it would seem that Juan would be charged with knowledge his brother has a shotgun in his waistband or on his side. At the very least, he knew at the point where they were confronting the two victims. But also, I think that even if he didn't know at the time they were running into the park, when the brother got the gun, he would have known at that point, too, unless he closed his eyes or turned his back. We really don't know about that. I mean, they could have run into the park and done different things. It happened within a couple of seconds. The victims crossed the street and then immediately they're confronted. Or he could have told his brother, you know, leave that gun here. He could have told his brother, yes, leave that gun here and then I'll just come with you and confront these victims together. Well, he went there and they confronted, his brother confronted them. But it's also right in front of his home. So it's not like going across town for a confrontation. It's not in front of his home. They passed his home. He lived in Trailer 18, which bordered the streets. And the testimony of the victim was that they walked, that both the defendant and his brother ran past their own home. Then the victims passed that home. And then these two popped up from behind a Ford Blazer. Now, why are they hiding? Why are they popping up from behind a Ford Blazer? It's bothering me here. And I think you better deal with it to put my mind at rest. Suppose I'm taking my family to go hiking at an area we sometimes hike, Pinnell Mountain Trail it's called. And sometimes we're getting in the car and I say, oh, wait a minute, I forgot my gun. And I go back inside, I get a .44 Magnum, put five cartridges in the six-cartridge revolver and put a speed loader with another six in my shirt pocket. And then I come back out to the car. And then we go on our hike. Mr. Kleinfeld does this because of grizzly bears, not that he's a hostile guy. Well, now you put my mind at rest. He lives in Alaska. For bear protection, because grizzly bears will try to eat you, and they often do eat tourists and stuff. And it happens. And so I get the gun. My wife knew I ran back to get the gun. Nevertheless, my wife would be very surprised if I shot a person. She would even be very surprised indeed if I shot a bear, unless the bear was attacking us and our lives were in danger. She knows I don't want to shoot a bear. It means filling out paperwork for a day or two at Fish and Game to show it was a self-defense bear. Big nuisance. So even though she knows I ran back to get the gun, and even though she knows I have a gun, and even though she knows I'm going into a potentially confrontational situation with critters that want to kill us, she'll still be real surprised if I use the gun. And I'm trying to think, what's the difference? I'm thinking, let's say Juan knows his brother is going back to get the gun, knows that there are these, what is it, Sirenos and Nortenos, I can't keep the gang straight. Right. Knows that there are these bad dudes that shot up their house. It might be reasonable to have a gun just in case things get out of hand with these people. Well, I think that's when we look at the- Why is it different from my going back for the gun for the bear? And my wife saying, you know, if my husband went out and shot a bear that he didn't have a right to shoot in self-defense, I'm not an accessory to what my husband did because I didn't know he was going to do that. Would your wife then lie to the police? Would she run away? And the police, when they're innocent all the time just because- Well, these are supporting factors. Does she have a motive to, well, does she have a motive against the bear, I guess? Does she have a history of bad relations with the bear? Everybody's scared of bears, everybody with any sense. So, I mean, I think we have a number of different-that's where the other factors come in play. So we not only have presence and companionships, but we also have a motive. Yeah, we've got motive, but- We have flight. So many people have motives and don't do anything about it. We have a lie. Anytime some romantic relationship goes sour, people have motives all over the place and they don't do anything about it almost all the time. I'm trying to figure out what this kid, Juan H., did. Well, let me talk about something else. There's a couple of theories in this case, a couple of theories of liability. One is that he specifically intended to kill the victim. There's also a- That Juan H. intended that? Yes, well, intended his brother to, yes. Intended his brother to shoot him. Right, right. There is also a theory in California called- I can't intend to do what I want to do. I can't intend to do what I don't do. Well, you intend to assist what the other person is doing. What did he do to assist? What did he do? Standing next to him. He provided backup support in case anything went wrong. Now, let me state the third element. By act or advice, aids, promotes, encourages, or instigates the commission of the crime. I think, you know, at least that's the way Beamer or Beeman stated it. Yes, and the way he- But you would accept that as a fair statement of the element? Yes, yes. And the way he acts by standing there is that he provides backup support so that it's two on two instead of one on one. Well, in case anything goes wrong, in case- What's he going to do about it? He has no gun. He doesn't even have a baseball bat. He's just standing there. If the victim goes for the brother's gun, he can intervene, right? He can what? He can intervene. He can help. He can help his brother. If it turns out to- He tries to grab his brother's shotgun. Yes. You're saying he could physically intervene. Yes, that's right. And he also, his mere presence there with his brother, backing him up, also provides a greater show of force. Okay, but now the element is- So as to intimidate the victims and keep them from acting. The element is by act or advise aides. So we could speculate about things he could do that would aid that didn't happen. Like, you know, there could have been a struggle and he helps his brother keep the gun. But is it a sufficient act that he's just standing behind his brother? Yes, because- You're saying because it shows- He didn't just appear out of thin air. I mean, the act was going with his brother to confront the victims. Let's say he hates these guys. He doesn't have to physically do anything. I mean, it's the choice of backing his brother up. But also look at it like he's standing behind his big brother. It's probably the safest place for him to be, in a sense. Let's say he hates these guys and he really does hope his brother- How would that be? What did he do? I'm sorry? Let's say he hates these guys and he really does hope his brother kills him. Right. Still, what did he do? He backed him up. I can't figure it out. I'm thinking I'm facing the bear and there's a bird next to him. The bird isn't making the bear any more dangerous to me. What's dangerous here is the shotgun. A shotgun is a very scary weapon. Some kid standing behind the guy with the shotgun, big deal. Also, I think you can tell we're having trouble here. Here we have a juvenile who gets a 34-year and 8-month sentence, first degree. I would like to ask why the prosecution went after first-degree murder as opposed to second-degree murder. But putting that aside, he stands behind his brother, not next to him. We're talking about show of force. It indicated to me that here. They're less than a foot away from each other. Right, but he's behind his brother. He's next to him and behind. So they're like this. I mean, he's not standing behind his brother for protection. They're like this. They're all very close to each other. One thing. Not show of force. Seems to me he'd be standing right up next to his brother, confronting them, saying, both of us are here, my brother's got a shotgun. He is next to him. The testimony, he was next to him and slightly behind. He is next to him. If I'm their adversary, I mean, it's like, are you alone? No, it's Mr. Smith, Mr. Wesson, and me. Two people can overtake one person much more easily than one person can overtake than if there were one person. I mean, this set it up so that it's a mano a mano. Do you have any California case where someone who was standing behind someone else didn't say anything, didn't have a weapon on them, in a situation like this, if it's not right in front of his house, near his house, and the person he's standing behind is his brother, his older brother? Like, any case. Do I have a Cranberry? No, I don't have a Cranberry. Do you have a case without all those, you know, all the similarities, but with some similarity where a man or a woman who's just standing someplace, other than like, you know, a lookout at a robbery, in this type of situation, is held to have aided and abetted the crime without doing anything more than providing a silent backup, to use the term you've argued? Is there any California? Because what we're looking at is California law. So is there any California? Right. So I have my own view about what is necessary for aiding and abetting in general, but I'm really interested in California precedents and to study those. Is there any California case that has had a fact pattern analogous to this? I don't know of a specific case that has those facts. It does seem sort of extreme to say this is aiding and abetting a murder and an attempted murder when there's so many inferences that can be drawn from the facts that we know. In other words, you could infer that he was with his brother, standing behind his brother, for a lot of reasons that do not constitute attempted murder or aiding a murder. Your Honor, I note that in my state brief, I did cite two cases. I cannot recall at this point what the specific facts of those cases are. However, I stated that although he committed no overt act with respect to the shooting, appellant provided assistance by making himself available to act as Felix's backup in the event things did not proceed as planned and giving the impression of a greater show of force than if Felix confronted the two victims alone. And I cited, and I see F cited, so, I mean, that indicates to me that they're not, they might not be precisely on point. However. We can decide in conference if we want to. However, I do cite two cases, Campbell and Fan. You don't remember what they said, though, and what the facts were? I don't. I'm sorry. I don't remember specifically what the facts. We might give you an opportunity, both of you, to submit a supplemental brief on California law. But the other thing I wanted to talk about California law is that there is a theory of natural and probable consequences. So if he knew, if his brother said, I'm going to go out there and I'm going to point this gun at them and scare them, and that's an assault, that, and he said, yeah, I want you, I encourage you to do that, but he didn't know his brother was going to shoot, that he could be liable for. That's right. That's right. I don't see why that's a natural consequence. I mean, as many times as I've gotten a gun and brought it along, I've never fired it at a bear. And it's not, it doesn't follow from having one that you're going to kill anything with it or even shoot it. Well, I think it follows that if you have a history of bad relations with someone else, that person, you believe, has just shot up your house, and then you get a gun to go confront them. I think it's. I'm afraid that if I, I really want to talk to this person who keeps scaring my family, but I'm scared of him myself. So before I talk to him, I want to make sure that if the talk goes sour, I can defend myself. You have set it up so that there is a high potential for violence, and the person who's standing next to you, backing you up, going with you, seeing you get the gun and then joining you, knows that there's a very good chance something's going to go wrong and you're going to need to use that gun. If I have some crazy neighbor who's harassing my family in potentially deadly ways, and I go across the street to talk to that neighbor, but I arm myself before I go, then I'm responsible for anything that goes wrong? Those victims did not confront the defendants. The defendants confronted the victims. They were the ones who ran and hid behind. I mean, this is not a self-defense situation. It's not that the victims were coming at them in an intimidating battle. The victims. I go across the street to talk to my neighbor. Right. And the victims here, I mean, they were returning from, they were unarmed. They were returning from the gym, and they went and they hid behind a car, popped out, confronted them with a gun, and then shot them. And we're supposed to believe that the minor had no idea what was going to happen? And then on top of that, we have the motive, we have the flight, and we have the lying to the police. He told the police he was inside the whole time. And that's plainly not true from the testimony. We know that he was outside. And during Palin's argument, we talked, Your Honor, asked about the flight, whether the flight was that he ran home. Well, there were two instances of flight here. First, he ran home, and then later when the police arrived, they were all trying to leave. The whole family was about to leave, right? That's right. The whole family was about to leave. And Appellant writes in his brief, well, you know, the parents aren't obeying the child. Well, the parents are protecting the child. And I think that the fact that they're all starting to leave does suggest that the parents at the very least. Well, not if they were going to McDonald's. I mean, was there any testimony about where they were going? Like, did they have their bags packed? They were leaving the, you know, the locale? Or were they just going, where were they going? Well, no, they hadn't left yet. So, of course, we don't know where they're going. But they all were in the car. It's after the shooting. Yes, it's shortly after the shooting. I mean, all of these things, do we have direct evidence? We don't have, like, the smoking gun in this case. This is not the case where, you know, you have the, you know, bloody victim lying on the ground and the person with the gun in his hand. But we don't need that. I mean, the Jackson standards. Another guy. Well, but the Jackson standard asks for reasonable inferences. And even if your honors believe that there are different inferences that could be made in this case and that you would not make the same inferences, they have to be resolved in favor of the prosecution. If I felt that way, they'd be resolved for the prosecution and for the State of California. But what I'm having trouble with is whether a jury can make reasonable inferences of all the elements in that Beaman test. Of the intent and of the sufficient act. But I appreciate your argument that the standing behind might be the act of backup and so on. But, you know, I, at least as one judge, I'm going to want to see California cases which I'll look for myself a bit. But I'll want us to order supplemental briefing. We didn't get to talk about the other issues. But at least I'm satisfied on the briefing on them. As are we. Thank you. Thank you, counsel. What I want to conclude with is, and your scenario is sort of similar to mine, is what the case law does say, what Beaman says is mere presence is not enough. And simply being there, even know, and mere knowledge is not enough. Simply being there, even knowing what the other person is going to be doing, does not make you guilty as an eater and a better. You have to. The record tell us, I don't want to know anything not in the record. Does the record tell us what happened to the brother? All that we know from the record is that he fled into his car, left the scene, and that's the last we know of him. There's nothing in the record about what occurred with the brother after that. Correct. And what I find disturbing is that that basically creates a strict liability standard. And what I thought was disturbing from the government's argument is he's in a situation that's going to, you should know better, it's going to end up bad and therefore you're responsible. And so he could be, we don't know what he was thinking or what he was doing or what he was telling his brother. He could be telling his brother, don't do this, keep a cool head. Okay, you got the gun, just keep it overhead and don't do anything with it unless they attack you. We don't know. It's all speculation. It's speculation whether or not he wanted his brother to do anything. It's speculation whether or not he wanted his brother to attack him. It's speculation. The other thing I find disturbing is part of the premise is that Maradona and Juan sees. I didn't understand what you said. Maradona, the brother, and Juan are at, when the whole story starts, they're at the, you know, they're being seen by the witness and the victim and they run. And the assumption is that Juan and his brother saw these two people. But there's actually no evidence of that. It's just, you know, the testimony was I'm walking down the street with who ends up being the victim. You don't need direct evidence of everything. I think circumstantial evidence and inference are plenty good enough for the whole conviction. Correct. What I'm saying is it's speculative whether or not these people even ran because these two people were walking down the street. In other words, you know, I go like this and the clock's hand is turning doesn't mean there's a cause and effect. Really because Magdaleno and Ramirez are walking down the street when they see the two people run to the trailer home doesn't mean they ran to the trailer home because of these two people. That's mere speculation. But I think what's most speculative is we have no idea if Juan has any idea of what Maradona is going to do when he confronts these people. There is a natural public consequence doctrine that if Juan specifically intends for Maradona to commit a crime, If he intended Maradona to assault them by pointing the shotgun at them and then his brother shoots them, he'd be liable, right? If that's a natural public consequence, yes. But the problem is I don't see the evidence of where he had any idea his brother was going to do anything with these people. The whole confrontation with the two victims occurred instantaneously. He pulled out the gun and he shot. No one had a chance to react. So we have no evidence of Juan's actual intent. To say, well, therefore, he didn't have a chance, he could have, he would have, he might have, isn't enough. The lack of opportunity to show any evidence is not a substitute for the evidence. And that's, again, if I'm accompanying my in-law, if you're hunting, if you're just walking in the woods and a bear attacks you. I don't hunt for bears. This is your self-defense. Exactly. Just walking in the forest and the bears attack you. The person who's with you under the government's theory is suddenly liable for your actions merely because of the knowledge and the presence and maybe not thinking straight immediately after the act. You talked real fast and I didn't understand what you said. The person who's with you is suddenly liable for your actions merely because of the knowledge and the presence and not thinking clearly after the act. You're saying if Judge Kleinfeld had a rifle, had a gun with him in case they were attacked by a bear and someone with him knows that, but then they see a bear that doesn't attack them and Judge Kleinfeld says, I think I'm just going to shoot that bear for my own malicious purposes and immediately does it, that the other person could be an aider and a better if this case stands up. Correct. The person hates bears, has an opportunity, if there's joint action. It's a little different mode of situation. Well, to make it maybe even a stronger case is that they were attacked earlier by a bear. But the other thing I think is also important to point out is Juan is 15 years old. Maradona is 22. And obviously his parents are his parents. Maradona was how old at the time of the incident? 22. And he was 15. Correct. I don't find it unusual for the brother to be tagging along with his older brother in front of his house. It was two doors away where this happened, even if it went a little bit beyond their house. And I think we're giving a 15-year-old way too much credit for making his own decisions in relation to his family. Any other questions? Thank you, counsel. Juan H. v. Serrata is submitted to adjourn until 9.30 tomorrow morning. Thank you for the argument. Thank you. Thank you. Thank you.
judges: D.W. Nelson, Kleinfeld, Gould